UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

DANIELA GILBERT,

      Plaintiff,

v.                                  Case No:  2:24-cv-423-JES-NPM

CHICO'S FAS INC.,

      Defendant.

_____

**OPINION AND ORDER**

This matter comes before the Court on review of the Motion for Summary Judgment (Doc. #31) filed on October 17, 2025 by Defendant Chico's FAS Inc. ("Chico's").  Plaintiff Daniela Gilbert ("Gilbert") filed a Response in Opposition (Doc. #32) on November 7, 2025.  Chico's filed a Reply (Doc. #33) on November 21, 2025, to which Gilbert Moved for Leave to file a Sur-reply (Doc. #34) on November 24, 2025.  Construing the Motion as requesting leave to amend, Magistrate Judge Nicholas P. Mizell granted Gilbert's Construed Motion to Amend on December 18, 2025 (Doc. #40).  Thus, on December 29, 2025, Gilbert filed her Amended Response (Doc. #43) and on January 20, 2026, Chico's filed its Amended Reply (Doc. #51).

For the reasons set forth below, Chico's motion is **GRANTED in part** in favor of Chico's on Counts II and IV, Count III is **dismissed with prejudice**, and the motion is otherwise **DENIED** as to Count I.

**I.**

Summary judgment is appropriate only when a movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists when the evidence is such that a reasonable trier of fact could return a verdict for the non-moving party.  McCreight v. AuburnBank, 117 F.4th 1322, 1329 (11th Cir. 2024) (citation omitted).  A fact is "material" if it may affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In ruling on a motion for summary judgment, a court views all evidence and draws all reasonable inferences in favor of the non-moving party.  Scott v. Harris, 550 U.S. 372, 378 (2007); Tana v. Dantanna's, 611 F.3d 767, 772 (11th Cir. 2010).  While it has not always been so, "the summary judgment rule applies in job discrimination cases just as in other cases." Chapman v. AI Transp., 229 F.3d 1012, 1026 (11th Cir. 2000) (en banc).  An employee may prove discrimination or retaliation with direct or circumstantial evidence.  Desert Palace, Inc. v. Costa, 539 U.S. 90, 99 (2003); Jefferson v. Sewon Am., Inc., 891 F.3d 911, 921

(11th Cir. 2018).  An employee opposing summary judgment with circumstantial evidence must present enough to create a triable issue of material fact.  Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011).  A triable issue exists where the evidence, viewed in the light most favorable to the employee, would allow a reasonable jury to infer that the employer has engaged in intentional discrimination or retaliation.  Lewis v. City of Union City, 934 F.3d 1169, 1185 (11th Cir. 2019).

## II.

Unless otherwise stated, the following material facts are derived from Gilbert's operative pleading, the First Amended Complaint (the "FAC" or "Complaint") (Doc. #8), Chico's Motion for Summary Judgment (Doc. #31), and Gilbert's Amended Response in Opposition to Chico's Motion for Summary Judgment (Doc. #43).

Plaintiff Daniela Gilbert identifies as a white Cuban American female. (Doc. #8 at ¶ 8.)  She began her employment with Defendant Chico's as "Manager, Raw Materials R & D" for White House Black Market, a Chico's brand, on December 6, 2021 after "an extremely rigorous process which involved five to six interviews." (Doc. #43 at p. 2.)

Throughout Gilbert's tenure with Chico's, her responsibilities were threefold.  First, she was responsible for developing and procuring the fabrics used to design Chico's

-3-

seasonal clothing campaigns. This responsibility involved conducting market research to "stay[] abreast of aesthetic raw material trends and technological developments[,]" in partnership with Chico's "design team" to obtain a "broad selection of fabrics" meant to be "affordable but look expensive." (Doc. #31-4 at ¶ 5.)

Second, Gilbert was responsible for the mechanics necessary to showcase the fabrics to the design team. This portion of her job was "very hands-on" and included receiving and unpacking boxes of fabrics, hanging them on a rack or placing them in the appropriate bin, lifting the fabric selections on and off the racks, transporting bins and racks of fabric to the design department "in a different part of the building," unpacking fabrics upon arrival and laying them out near trend boards, and "repeat[ing] this process and continue[ing] to source until the design team made its final selections." (Id.)

Finally, Gilbert was tasked with addressing any issues that arose following the design team's selections. This responsibility included, among other things, problem-solving issues regarding "delays in production or problems with a fabric's weight, wrinkling, color, or other issues[.]" (Id. at ¶ 6.)

Shortly before Gilbert moved to Fort Myers, Florida to begin working on site at Chico's Corporate Office Campus, Gilbert informed her direct supervisor, Lisa Corbett ("Corbett") via text

-4-

message that she had injured her shoulder and that her ability to lift and carry may be limited until she saw a doctor for the injury. (Id. at ¶ 11.) Several months later, on July 22, 2022, Gilbert had surgery to repair her rotator cuff. Chico's approved Gilbert's request for medical leave beginning that day. (Doc. #31 at p. 10.)

Although the circumstances giving rise to Gilbert's termination are somewhat in dispute, both parties agree that even before Gilbert's medical leave of absence, Gilbert's employment with Chico's was not without issues. Although Gilbert believed that she had been hired to procure fabrics for the Chico's White House Black Market "main line" of clothing, during the first two months of her employment Gilbert was assigned to Chico's "outlet" team and tasked with designing clothing created directly for Outlet stores. Gilbert avers that Corbett gave Chrissy Hull ("Hull"), a white non-Cuban woman, preferential treatment by not placing her on outlet. (Doc. #43 at p. 8.)

Additionally, Gilbert avers that Corbett made two allegedly racist comments. "[A]bout a month in" to her employment with Chico's, Corbett told her "to be careful" with two other Chico's employees "because they were Indian." (Doc. #43-5 at ¶ 23.) In response, Gilbert asked Corbett "What does that have to do with anything?", and corrected Corbett by pointing out that one of the

employees was actually from El Salvador. (Id.) When certain Chico's employees from the Hong Kong office had come to visit Chico's Fort Myers campus, Gilbert avers that Corbett advised them, in front of Gilbert, not to stay in Cape Coral (a city proximate to the Fort Myers campus) "because it's mixed." (Doc. #31-1 at p. 14.) In a signed affidavit, Corbett maintains that both of these allegations are "patently false." (Doc. #31-4 at ¶¶ 25-26.)

According to Chico's, from the beginning "Gilbert struggled to translate expensive to affordable without sacrificing look" and "her selections were cheap looking and lacked the right aesthetic for the brand." (Doc. #31-4 at ¶ 7.) Moreover, "Gilbert also struggled with managing other parts of her job, particularly at a strategic level, because she lacked sufficient problem-solving skills." (Id. at ¶ 7.) Finally, Gilbert "tended to get defensive or make excuses when she was given negative feedback and showed a lack of accountability for her performance struggles." (Id. at ¶ 9.) According to Chico's, "Corbett received complaints from the design team about [Gilbert's] work." (Doc. #31 at ¶ 7.)

Initially, Corbett offered "informal feedback" on Gilbert's performance struggles, but when she did not "see sufficient improvement," Corbett initiated a "formal performance meeting" with Gilbert on June 29, 2022. (Doc. #31-4 at ¶ 10.) Chico's Human Resources Manager, Jody Warder ("Warder"), attended the

meeting. (Id.)  During the meeting, Corbett gave Gilbert "detailed feedback about the areas where [she] felt [Gilbert] was not meeting her job expectations[,]" and summarized the feedback in an email sent to Gilbert that same day.  (Id.)  Gilbert responded to the email two weeks later acknowledging Corbett's feedback.

Before Gilbert left for medical leave in July 2022, she received a pay increase of 2.75%.  While Gilbert contends that this pay increase constituted a merit raise, (Doc. #43 at ¶ 9), Chico's avers that the increase "was not intended to indicate Ms. Gilbert's performance had improved."  (Doc. #31 at ¶ 9.)

On August 30, 2022, Gilbert contacted Amy Tobey ("Tobey"), Chico's Leave Administrator, requesting to return to work on September 6, 2022.  Gilbert furnished Tobey with a doctor's note indicating the following restrictions:  no overhead use, no pushing, no pulling, and no reaching. (Id. at ¶ 11.)  Because the doctor's note did not set a time frame for how long the restrictions would be in place, Tobey requested Gilbert obtain this information.  (Id.) Gilbert responded that the restrictions were in place until the end of October, that the restrictions were the "same restrictions" she had since the beginning of her employment at Chico's, that she could sufficiently perform her job with the restrictions, and that Corbett had never indicated that the restrictions were a problem.  (Id. at ¶ 12.)

When the Leaves and Benefits department contacted Corbett regarding Gilbert's response, Corbett indicated that she did not recall any previous restrictions other than physical therapy appointments. (Id.) According to Gilbert, this interaction caused her relationship with Corbett to "sour" because she "believed Ms. Corbett was a liar when she said she did not recall [Gilbert] having restrictions." (Doc. #31 at p. 6.)

Ultimately, Gilbert's request for accommodations was denied because "Corbett was concerned about [Gilbert's] ability to perform the physical part of the job with the proposed restrictions[.]" Warder agreed that Gilbert likely could not perform her essential job functions with those restrictions. (Doc. #31 at ¶ 14.)

On September 7, 2022, Tobey received an updated doctor's note from Gilbert requesting the following accommodations: (1) no lifting more than five to ten pounds with right arm until October 1, 2022; and (2) physical therapy for approximately one to two weeks from 7:30-8:30 a.m. twice weekly.  After discussing the request for accommodations with Corbett and Warder, Tobey granted Gilbert's accommodations requests and Gilbert returned to work on September 8, 2022.  (Id. at ¶¶ 15, 16.)

After Gilbert's return, she received mixed feedback about her work.  For example, Corbett received complaints from the design

-8-

team, including from Danielle Konotop, the Vice President of design, regarding their growing dissatisfaction with Gilbert's "fabric selections, and her attitude, response to feedback, and disengagement during meetings." (Doc. #31 at ¶ 19.) However, Sergio Duque, Senior Designer for Dresses at White House Black Market, stated in an affidavit attached to Gilbert's response that Gilbert was "professional, responsive, and on target with product needs, making collaboration a pleasant and efficient experience." (Doc. #43-6 at p. 1.) He further stated that he never heard complaints about Gilbert from his supervisor, the director of design, and that "[g]iven his role as a senior designer reporting to [the Design Director], if there had been significant performance issues with Gilbert that affected [their] day-to-day work, [he] would have expected to be informed[,]" but no such issues were communicated to him. (Id. at p. 2.)

During that time, Corbett "regularly provided informal feedback verbally and via email, some of which [she] certainly would characterize as negative . . . ." (Doc. #31-4 at ¶ 17.) After several months of insufficient improvement, Corbett, as Gilbert's direct supervisor, and Warder, as the HR Manager, placed Gilbert on a Performance Improvement Plan ("PIP"). (Doc. #31 at pp. 19-20.)

Corbett and Warder met with Gilbert on March 13, 2023 to discuss the PIP. During that meeting, Corbett explained to Gilbert that she had not shown sufficient improvement and that the design team was dissatisfied with her performance. (Id. at ¶ 20.) She also gave examples of Gilbert's struggles with problem solving, lack of initiative, and lack of attention to detail. These included (1) Gilbert's failure to "bring back any new items or headers from the PV Paris fashion Show," (2) that Gilbert failed to "participate verbally during meetings . . . there is little to no interaction from [Gilbert] in bringing fabric options/thoughts/ideas," (3) that when there was "an issue with bulk timing and matte vs. satin side" Corbett had to "jump in and resolve the issue as [Gilbert] [was] not able to assist with a solution and fabric delivery was now at risk," (4) certain fabric was on fast track for delivery and when design inquired where it was Gilbert responded that it "slipped through the cracks," and (5) that Gilbert was given guidance not to present cotton from a certain vendor but nevertheless presented fabric from that source. (Doc. #31-2 at pp. 10-11.)

After the meeting, Gilbert provided detailed written responses disagreeing, on all counts, with Corbett's assessment of her performance including (1) that "90% of the headers presented" to the design team were from the PV Paris fashion show or a separate

fashion show in New York City, (2) that Gilbert had received approval and accolades from members of the design team and that she interjects during meetings with design team when her input is needed, (3) that, as for the bulk-timing issue identified by Corbett, Gilbert received that request the day before she was scheduled to be out of office in November 2022, thus another employee was tasked with communications with the mill, (4) the fabric that had been fast tracked for delivery slipped through cracks because Gilbert's aunt "fell ill" that day and died three days later, and (5) Gilbert sourced the fabric sample from that mill with permission and approval from the design team. (Id. at p. 11.)

Both Corbett's critiques and Gilbert's responses were incorporated in writing into Gilbert's "Initial Performance Improvement Plan" document. (Id.) Thirty days later, Corbett and Warder met with Gilbert for her first PIP check-in to discuss whether Gilbert had made requisite progress per the terms of the PIP. (Doc. #31 at p. 7.) Corbett, once again, identified several areas with which Gilbert needed improvement, including (1) deliverables and follow through, (2) lack of initiative on problem solving, (3) lack of follow up, (4) attention to detail, and (5) quality of work. Corbett also included specific instances in which her performance fell short of expectations during March and April

-11-

of 2023. (Doc. #31-2 at p. 19.) Gilbert, for her part, provided detailed written responses noting Corbett's issues with her performance, responding to and disagreeing with Corbett's characterization of her performance, and seeking advice and suggestions for how to proceed. (Id.)

In May 2023, Corbett and Warder conducted a second and final PIP check in with Gilbert. (Doc. #31 at p. 8.) In the document summarizing that meeting, Corbett expressed that the Chico's team still did not feel that Gilbert was making improvements with her performance, and once again identified areas of concern including (1) deliverables and follow through, (2) lack of initiative on problem solving, and (3) attention to detail. Corbett also included specific instances throughout March and April 2023 that she felt Gilbert fell short of her performance goals. (Doc. #31-2 at pp. 20-22.) Gilbert did not provide written responses to Corbett's concerns but acknowledged the document with her signature. (Id.) At no point during either PIP check-in did Corbett raise concerns about the PIP being implemented due to her race, national origin, or her actual or perceived disability. (Doc. #31 at ¶ 23.)

After Gilbert's second PIP check-in, Corbett made the recommendation to terminate Gilbert's employment with Chico's. (Id. at ¶ 25.) On May 22, 2023, Warder met with Andrea Morganelli,

Chico's Director of Compliance and Associate Relations and Lisa Hultgren, Chico's Human Resources Director to discuss Corbett's recommendation to terminate Gilbert. At some point after that meeting, the termination decision was approved, and a termination meeting was set for June 2, 2023. (Id.)

On June 2, 2023, Gilbert sent the following email to Warder, formally raising, for the first time, her concerns regarding workplace discrimination:

> Good morning. Hope you are well.
>
> I believe this PIP is unfounded and it is concerning to me.
>
> When I left for medical leave in July of 2022, I was given a merit raise and once I returned in September, I received accolades on my performance from Lisa, Danielle, and both design directors on the team.
>
> I believe this PIP is not related to my performance, but is retaliation for my medical leave and discriminatory in nature with regards to my Cuban heritage.
>
> Thank you.
>
> [Gilbert]

Warder responded that morning,

> Good morning [Gilbert],
>
> Thank you for escalating your concern. I will share your concerns with our Associate relations team and someone will reach out to you shortly. In the meantime, I have asked [Corbett] to pause on the performance feedback meeting scheduled for today.

-13-

Thanks,

[Warder]

Ultimately, the termination meeting was rescheduled to Monday June 5, 2023, at which time Gilbert's employment with Chico's was terminated. Following Gilbert's termination, her role was filled by Hull.

Gilbert filed a Complaint for discrimination with the Equal Opportunity Employment Commission ("EEOC") and received her Notice of Right to Sue on February 7, 2024. Gilbert then filed a complaint for declaratory relief and damages against Chico's on June 7, 2024 asserting the following claims: racial discrimination in violation of Title VII of the Civil Rights Act of 1964 (Count I), Retaliation in violation of Title VII of the Civil Rights Act of 1964 (Count II), Failure to Accommodate in Violation of the Americans with Disabilities Act of 1990 (Count III), and Retaliation in Violation of the Americans with Disabilities Act of 1990 (Count VI).

## III.

In its Motion (Doc. #31), Chico's moves for summary judgment on each of Gilbert's claims for relief for various reasons. The Court will address each count in turn.

**A. Count I (Racial Discrimination in Violation of Title VII of the Civil Rights Act of 1964)**

-14-

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, *or otherwise to discriminate against any individual* with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (emphasis added). See also Lewis v. City of Union City, Georgia, 918 F.3d 1213, 1220 (11th Cir. 2019) (en banc). To succeed under Title VII, an employee must prove (1) intentional racial discrimination (2) that caused an injury. Melton v. I-10 Truck Ctr. Inc., 166 F.4th 905, 912 (11th Cir. 2026). An employee may present direct or circumstantial evidence to prove her case. Id. (citing Ziyadat v. Diamondrock Hosp. Co., 3 F.4th 1291, 1296 (11th Cir. 2021)). Either way, an employee suing under Title VII must prove her employer acted with discriminatory intent. See Jefferson v. Sewon Am., Inc., 891 F.3d 911, 920 (11th Cir. 2018); Ismael v. Roundtree, 161 F.4th 752, 758 (11th Cir. 2025).

Chico's contends that summary judgment is appropriate because "the record is wholly devoid of any evidence that would establish Chico's intentionally treated [Gilbert] differently because of her race or national origin." (Doc. #31 at p. 12.) Gilbert asserts that she has presented sufficient direct and circumstantial evidence to show intentional discrimination. (Doc. #43 at p. 18.)

**Direct Evidence:** Gilbert fails to identify specific statements which constitute direct evidence supporting her Title VII claim. Construed in a light most favorable to Gilbert, the record reflects – at most – that Corbett (Gilbert's supervisor) made two general discriminatory statements during the course of Gilbert's tenure at Chico's, neither of which was about Gilbert herself nor her protected characteristics. First, Gilbert testified that "about a month in" to her employment with Chico's, Corbett told her "to be careful" with two other Chico's employees "because they were Indian." (Doc. #43-5 at ¶ 23.) Second, Gilbert avers that Corbett advised certain visiting employees from Hong Kong not to stay in Cape Coral "because it's mixed." (Doc. #31-1 at p. 14.)

Setting aside that Corbett denies making either statement, "only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." Melton, 166 F.4th at 913 (quoting Jefferson, 891 F.3d at 922). Here, Corbett's purported racist remarks were neither addressed to Gilbert nor applicable to "White Cuban females," the protected class with which Gilbert identifies.[1] Gilbert testified during her deposition that

---

[1] Although Gilbert's Complaint specifies that she is a "Cuban White Hispanic Female" (see Doc. #8 at ¶ 8), in her Response to Chico's

she "could not recall" any examples of Chico's discriminating against her because of her national origin. (Doc. #31-1 at p. 172.)

Thus, the Court finds that Corbett's remarks are not direct evidence of discrimination pertaining to Gilbert's termination from employment with Chico's. See Ross v. Rhodes Furniture, Inc., 146 F.3d 1286, 1291 (11th Cir. 1998) (noting that racist remarks not addressed to the complaining employee ordinarily do not constitute direct evidence of intentional discrimination for Title VII purposes); Melton, 166 F.4th at 913 (same).

**Circumstantial Evidence**: Of course, an employee may also rely on circumstantial evidence to prove her claim. Generally, courts apply the burden-shifting McDonnel Douglas framework to evaluate claims for discrimination based on circumstantial evidence. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973). If a plaintiff can present sufficient circumstantial evidence to state a prima facie case under McDonnel Douglas, she is entitled to a rebuttable presumption of illicit intent. Ismael v. Roundtree, 161 F.4th 752, 764-65 (11th Cir. 2025). However, even if a plaintiff cannot make her prima facie case under McDonnel Douglas, that is not the end of the inquiry. Instead, "an employee may

---

Summary Judgment Motion she contends that counsel for Chico's "presume[ed] to define [her] race for her as 'Hispanic' when [she] actually identifies as 'Latino or Cuban.'" (Doc. #43 at ¶ 3).

always prove a claim of discrimination by presenting sufficient evidence that would 'permit[ ] a reasonable factfinder to find that the employer [discriminated] against the employee,' even if they do not rely on this burden-shifting framework." Melton, 166 F.4th at 913 (citing Berry v. Crestwood Healthcare LP, 84 F.4th 1300, 1310-11 (11th Cir. 2023)). Courts "have often called this 'rearticulation of the summary judgment standard' the 'convincing mosaic' metaphor." Id. (citing Tynes v. Fla. Dep't of Juv. Just., 88 F.4th 939, 946 (11th Cir. 2023)). The Eleventh Circuit has made clear that the "convincing mosaic" standard is merely a helpful stand-in for the Rule 56 summary judgment standard in employment discrimination claims, "not a legal test and not a framework." Id. (quoting Berry, 84 F.4th at 1311.)

When proceeding under McDonnell Douglas, a plaintiff bears the initial burden of establishing a prima facie case of discrimination by showing "(1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated "similarly situated" employees outside her class more favorably." Lewis, 918 F.3d at 1220-21 (citing McDonnell Douglas, 411 U.S. at 802). It is not disputed that as a Cuban white female, Gilbert belongs to a protected class. Nor is it disputed that Chico's institution of the PIP and ultimate

termination of Gilbert's employment constituted adverse employment actions.  Instead, Chico's asserts that Gilbert has failed to show Chico's treated similarly situated employees more favorably. (Doc. #31 at p. 14.)

Gilbert has proffered two examples of non-Cuban employees that she believes were treated more favorably – Candie Walker and Chrissy Hull.  Chico's contends that neither were similarly situated to Gilbert because they did not hold the same position. According to Chico's, Hull was the associate who originally reported to Gilbert before being transferred to a manager position with a different Chico's brand, and Walker worked directly for the original Chico's brand as a manager.  (Id.)  Gilbert responds that, at least as to Hull, she has met her burden to show that a similarly situated individual outside of her protected class was treated more favorably because Hull replaced Gilbert after Gilbert was terminated from employment.  (Doc. #43 at p. 13.)

The Court agrees with Gilbert as to Hull. A Title VII plaintiff can prove that similarly situated employees were treated more favorably by "showing that she was replaced by someone outside of her protected class."  Phillips v. Legacy Cabinets, 87 F.4th 1313, 1322 n.6 (11th Cir. 2023); see also Melton, 166 F.4th at 913 (same).  Here, Gilbert contends – and Chico's does not dispute (see Doc. #51 at p. 4) – that Hull, a white non-Cuban woman,

-19-

replaced Gilbert following her termination from Chico's. Because Hull is outside of Gilbert's protected class of a white Cuban woman, Gilbert has presented sufficient evidence to satisfy this prong of her prima facie case under McDonnel Douglas.

Having found that Gilbert has presented sufficient evidence to satisfy the prima facie case under McDonnel Douglas, the Court must next consider whether Chico's can present a legitimate, non-discriminatory rationale for its institution of the PIP and for Gilbert's ultimate termination. Chico's avers that it terminated Gilbert's employment because she failed to meet the requirements of her job and her performance did not meet her supervisor's expectations despite (1) informal coaching, (2) a formal performance meeting, (3) institution of the PIP, and (4) two PIP check-in meetings. (Doc. #31 at p. 15.) These are legitimate reasons for termination, if true and not pretextual.

To support its proffered rationale, Chico's cites to Gilbert's initial PIP plan, which details several areas wherein Gilbert had been falling short. (Doc. #31-2 at pp. 10-11.) Chico's also refers to the "thirty-day check in" portion of the PIP document, wherein several more areas of struggle had been identified. (Doc. #31-2 at p. 19.) Finally, Chico's points to the portion of the PIP document which documented Gilbert's second and final PIP check-in. Within that document, Corbett and Warder

had identified three overarching areas wherein they felt that Gilbert continued to fall short including (1) deliverables and follow through, (2) lack of initiative on problem solving, and (3) attention to detail.  Corbett also included specific instances throughout March and April 2023 that she felt Gilbert fell short of her performance goals.  (Doc. #31-2 at pp. 20-22.)

Gilbert responds that she has presented sufficient circumstantial evidence to show that these reasons were "mere pretext," raise a reasonable inference of intentional discrimination, and defeat Chico's Motion for Summary Judgment. (Doc. #43 at pp. 11-13.)  "To show pretext, a plaintiff must show '*both* that the [employer's] reason was false, *and* that discrimination was the real reason' for the adverse action." Ismael, 161 F.4th at 761 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 115 (1993)).  However, showing pretext is not the exclusive means for a plaintiff to survive summary judgment.  Id. at 762.  Instead, after the defendant proffers a legitimate, nondiscriminatory reason for the termination, the plaintiff's "opportunity to demonstrate that the proffered reason was not the true reason for the employment decision . . . merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination."  Thus, "'[s]he may succeed . . . either directly by persuading the court that a discriminatory

reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" Id. (quoting Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)).

Gilbert presents several pieces of circumstantial evidence that she believes come together to cast doubt on Chico's proffered rationale for her termination (Gilbert's performance issues) and create a triable jury issue as to her claim for national origin discrimination, including: (1) Corbett's discriminatory comments about minorities (Doc. #43 at p. 13), (2) Gilbert's "extensive experience" in high fashion in New York City (id. at ¶ 6), (3) that she received praise from Corbett as late as May 12, 2023, when Corbett praised Gilbert's "swift action and complete follow through" on a deliverable (id. at ¶ 7), (4) the affidavit from Sergio Duque, Director of Design for Chico's, who described Gilbert as professional, responsive, and on target with product needs (id. at ¶ 8), (5) the 2.75% raise Gilbert received immediately prior to her surgery in July 2022 (id. at ¶ 9), and (6) Corbett's preferential treatment of non-minorities, including Hull (id. at ¶ 31).

Viewed in a light most favorable to Gilbert, the Court finds that the record evidence is sufficient to create a triable issue of fact as to Gilbert's claim for Title VII national origin

discrimination.    True, Gilbert's argument that Corbett treated Hull more favorably based on evidence that Hull was assigned to Chico's "main line" of clothing while Gilbert was relegated to "outlet," is likely insufficient, since Gilbert herself admits that the responsibilities for both the "outlet" Raw Materials R & D and "mainline" Raw Materials R & D position are "similar", and in any event, Gilbert was switched from outlet to mainline two months into her tenure at Chico's.   (Doc. #31-1 at pp. 45-47.) However, Hull's replacement of Gilbert following her termination may allow a reasonable jury to infer that intentional discrimination occurred.  A reasonable juror could also very well find that Corbett's discriminatory comments suggest a bias against minorities generally, even if the alleged comments pertained to persons outside of Gilbert's protected class of a white Cuban American female.    Finally, evidence – albeit from non-decisionmakers – supporting Gilbert's assertion that she was good at her job may create a genuine issue of disputed material fact and refute Chico's proffered evidence that Corbett, Warder, and other decisionmakers evaluated Gilbert's job performance and found that she did not meet the expectations of her role.

Accordingly, Chico's has not satisfied the summary judgment standard because Gilbert has presented sufficient evidence, even if humble, to create a genuine material as to whether Chico's

decisions to institute the PIP and terminate her employment were based on her protected status as a white Cuban American female.

**B.    Count II (Retaliation in Violation of Title VII of the Civil Rights Act of 1964)**

In Count II, Gilbert asserts that Chico's retaliated against her by reprimanding her (i.e. the PIP) and terminating her employment after she complained of disparate treatment based on her race and national origin.  (Doc. #8 at pp. 7-8.)

Title VII of the Civil Rights Act of 1964 prohibits an employer from retaliating against an employee "because [the employee] has opposed any practice" made unlawful by Title VII. 42 U.S.C. § 2000e-3(a).  To establish a retaliation claim under Title VII, a plaintiff must show "that she engaged in statutorily protected conduct; she suffered an adverse employment action; and a causal relation exists between the two events." Berry v. Crestwood Healthcare LP, 84 F.4th 1300, 1307 (11th Cir. 2023).

Chico's does not contest that Gilbert engaged in statutorily protected conduct when she complained of Title VII discrimination based on her protected status as a white Cuban American woman. Nor does it challenge that institution of the PIP and eventual termination of employment constituted adverse employment actions for purposes of her Title VII claim.  Instead, Chico's asserts that "the undisputed record evidence shows [Gilbert's] retaliation

-24-

fails out of the gate because she did not complain about race or national origin discrimination until after the PIP and after Chico's decided to terminate her employment."  (Doc. #31 at pp. 18-19.)

To prove a causal connection, a plaintiff need only demonstrate "that the protected activity and the adverse action were not wholly unrelated." Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1337 (11th Cir. 1999).  This element is to be construed broadly, and "a plaintiff satisfies this element if he provides sufficient evidence that the decision-maker became aware of the protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action." Id.

Gilbert first complained of Title VII discrimination in her June 2, 2023 email to Warder.  But the PIP was issued three months prior in March 2023, and Corbett submitted the Associate Relations Termination Request form to HR in May 2023, several weeks prior to Gilbert's June 2, 2023 email.  (Id.)

Gilbert argues, however, that she has met her burden of proof on her retaliation claim because "less than two months" elapsed between Chico's institution of the PIP and her June 2, 2023 email. (Doc. #43 at p. 14.)  While the timeline is correct, no retaliation was possible because the protected activity occurred months *after*

the adverse action.  The undisputed record evidence reflects that the decision to institute a PIP for Gilbert occurred *before* Gilbert engaged in her alleged protected activity.  Thus, temporal proximity is insufficient to show a causal connection between the June 2, 2023, protected email and the March 2023 issuance of Gilbert's PIP.  See Cotton v. Cracker Barrel Old Country Store, Inc., 434 F.3d 1227, 1233 (11th Cir. 2006) ("When an employer contemplates a given action before the harassment takes place, temporal proximity between the action and the incident of harassment alone will not suffice to show causation.").

As for Chico's decision to terminate Gilbert's employment, Gilbert contends that although Corbett's Associate Relations Termination Request Form had an initial date of May 22, 2023, its approval by Morganelli does not contain a date.  Thus, according to Gilbert, it is not clear on this record whether Gilbert's June 2, 2023 email came before the ultimate termination decision.  (Doc. #43 at p. 7.)  But even assuming that Morganelli approved Gilbert's termination at some point subsequent to Gilbert's June 2, 2023, email, Gilbert had already been subject to the issuance of her PIP in March 2023.  "Title VII's anti-retaliation provisions do not allow employees who are already on thin ice to insulate themselves against termination or discipline by pre-emptively making a discrimination complaint."  Alvarez v. Royal Atl. Devs., Inc., 610

F.3d 1253, 1270 (11th Cir. 2010).    See also Swartz v. Interventional Rehab. of S. Fla., Inc., No. 21-14137-CIV, 2022 WL 1664128, at *10 (S.D. Fla. Mar. 30, 2022) ("When an employee engages in misconduct that triggers a process leading to his termination, the mere fact that he subsequently engaged in a protected activity does not establish causation."); Buchanan v. Delta Air Lines, Inc., 727 F. App'x 639, 642 (11th Cir. 2018) (same).

Thus, Chico's has established that there was no causal connection between the adverse employment actions and any statutorily protected activity and its Motion for Summary Judgment as to Count II is granted.

**C.    Count III (Failure to Accommodate in Violation of the Americans with Disabilities Act of 1990)**

In Count III, Gilbert alleges that Chico's violated the Americans with Disabilities Act when it denied her first request for reasonable work accommodations on September 6, 2022. (Doc. #8 at pp. 9-10.) In its Motion for Summary Judgment, Chico's argues that (1) Gilberts's failure-to-accommodate claim is time barred because Plaintiff filed her EEOC charge more than 300 days after she allegedly first requested accommodations, and (2) even if her claim is not time-barred, Gilbert cannot state a prima facie claim for failure to accommodate. (Doc. #31 at pp. 21-22.)

A claim brought pursuant to the ADA is subject to a 300-day statute of limitation in which to file an administrative charge of discrimination.  42 U.S.C. § 2000e-5(e)(1).  The 300-day period begins running for each discrimination claim when that claim accrues. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 102 (2002).  If a plaintiff does not present her claims to the EEOC before the end of that period, she is barred from pursuing relief. Id.  The time at which a claim accrues depends on whether the plaintiff has alleged a discrete violation or a continuing violation.  Id. at 111.  A "discrete" retaliatory or discriminatory act occurs "on the day that it happened." Id.  "A party, therefore, must file a charge within . . . 300 days of the date of the act or lose the ability to recover for it." Id.  When the nature of an act, however, involves repeated conduct, the "unlawful employment practice" cannot be said to have occurred on any particular day. Thus, "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." Id. at 116-117.

As Chico's argues, it is undisputed that "the only accommodation Chico's denied was the request to return on September 6, 2022 with the restrictions in the August 30, 2022 doctor's note[,]" and Gilbert "filed her only EEOC Charge on July 26, 2023 — 329 days later."  (Doc. #31 at p. 21.)  Gilbert responds that

this argument necessarily assumes that the accommodation granted on September 8, 2022 was not discriminatory or unreasonable, and that, in any event, Chico's failure to grant Gilbert's initial accommodation request "continued up to the date of [her] termination," thus her failure to accommodate claim is not time-barred. (Doc. #43 at p. 15.) In other words, Gilbert argues that her failure to accommodate claim is a "continuing violation" that did not accrue until the termination of her employment.

The Court agrees with Chico's that Gilbert's failure to accommodate claim is time-barred. Gilbert's claim for failure to accommodate involves discrete acts of alleged discrimination rather than a continuing violation. See Abram v. Fulton Cnty. Gov't, 598 F. App'x 672, 676 (11th Cir. 2015) (holding that the district court "correctly concluded that the continuing violations doctrine was inapplicable" in a case where a plaintiff alleged specific instances of the defendant's denial of her requested accommodations); Elmenayer v. ABF Freight Sys., Inc., 318 F.3d 130, 135 (2d Cir. 2003) (same).

Gilbert's argument that her failure to accommodate claim includes her September 8, 2022, accommodation request does not change the result. This request was granted by Chico's that same day. Gilbert does not explain how granting the September 8, 2022 accommodation request can constitute a failure to accommodate

-29-

under the ADA.  Even if unreasonable, as Gilbert now suggests, it was the accommodation she requested.  The cause of action consists of failure to make a reasonable accommodation, Beasley v. O'Reilly Auto Parts, 69 F.4th 744, 754 (11th Cir. 2023) (explaining that "[u]nder the ADA unlawful discrimination includes 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability' unless doing so 'would impose an undue hardship' on the employer"), not granting a request which the employee later believes was insufficient.  In any event, the claim would also be precluded by the 300-day time bar.

Accordingly, the Court finds that Gilbert's failure-to-accommodate claim is time barred and dismisses Count III from the operative complaint (Doc. #8.)

D.    **Count IV (Retaliation in Violation of the Americans with Disabilities Act of 1990)**

In Count IV, Gilbert alleges that Chico's retaliated against her by instituting the PIP and terminating her employment after she engaged in statutorily protected activity by requesting ADA accommodations.  (Doc. #8 at pp. 11-12.)

To establish a claim of retaliation, Gilbert must prove (1) that she engaged in a statutorily protected activity, (2) that she suffered a materially adverse action, and (3) that there exists a

causal relationship between the two events.  Mullin v. Sec'y, U.S. Dep't of Veterans Affairs, 162 F.4th 1296, 1315 (11th Cir. 2025) (citing Todd v. Fayette Cnty. Sch. Dist., 998 F.3d 1203, 1219 (11th Cir. 2021)).

As with Gilbert's claim of retaliation under Title VII, Chico's does not dispute that Gilbert engaged in a statutorily protected activity when she made her two requests for accommodations in September 2022.  Nor does Chico's dispute that issuance of the PIP in March 2023 and Gilbert's termination from employment in June 2023 constitute adverse employment actions. (Doc. #31 at pp. 22-23.)  Instead, Chico's argues that the Court should grant summary judgment in its favor because Gilbert has failed to establish causation between the statutorily protected activity and the adverse employment actions.  (Id.)  Gilbert responds that the causal connection element has been met by the "close temporal proximity" between her protected activities and Chico's adverse employment actions.  (Doc. #43 at p. 16.)

"'The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action.'"  Hitt v. CSX Transp., Inc., 116 F.4th 1309, 1317 (11th Cir. 2024) (quoting Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007)).  "But 'mere temporal proximity, without more, must be very close.'"  Id.  Thus, "'[a]

-31-

three-to-four-month disparity between the statutorily protected expression and the adverse employment action is not enough' to establish causation from temporal proximity." Id.

It is undisputed that more than six months passed between Gilbert's second request for accommodation and issuance of the PIP, and nearly nine months passed between that same request and Gilbert's termination from employment.  Without some other evidence tending to show a causal connection, which is simply not present on this record, Gilbert cannot meet her burden on the causation element.  Thus, Chico's Motion for Summary Judgment is granted on Count IV.

Accordingly, it is now

**ORDERED:**

Defendant's Motion for Summary Judgment (Doc. #31) is **GRANTED in part and DENIED in part**.  Summary Judgment is granted as to Counts II and IV in favor of Defendant Chico's FAS Inc., and against Daniela Gilbert, who shall take nothing as to those counts. Count III is dismissed with prejudice.  Count I remains pending. The Clerk shall withhold entry of judgment until the conclusion of the case.

**DONE AND ORDERED** at Fort Myers, Florida, this ___17th___ day of March 2026.

-33-

_____
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies:
Parties of record

-33-